IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CASIMIR GEORGE, JOSHUA CLARK, SHYENNE WHITE, Individually and as Next Friend of K.W., a Minor, BEVERLY ROSS, Individually and as Representative of the Estate of DOROTHY MARIE BAKER, Deceased, AND BURNEY THIBODEAUX, Individually and as Representative of the Estate of LILLIE McNAIRY, Deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>MEMORIAL HERMANN HEALTH SYSTEM, and MEMORIAL HERMANN MEDICAL GROUP,<br><br>Defendants. | CIVIL ACTION NO. 4:22–CV–01073<br>(Jury Trial Requested) |

## PLAINTIFFS' ORIGINAL COMPLAINT

1.  Plaintiffs CASIMIR GEORGE, JOSHUA CLARK, SHYENNE WHITE, Individually and as Next Friend of K.W., a Minor, BEVERLY ROSS, Individually and as Representative of the Estate of DOROTHY MARIE BAKER, Deceased, AND BURNEY THIBODEAUX, Individually and as Representative of the Estate of LILLIE McNAIRY, Deceased, bring this case against Defendants MEMORIAL HERMANN HEALTH SYSTEM and MEMORIAL HERMANN MEDICAL GROUP under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Section 1 of the 1866 Civil Rights Act, 42 U.S.C. §1981; the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd; and Texas State Law.

# I.
# JURISDICTION AND VENUE

2. The Court has jurisdiction over the controversy pursuant to 28 U.S.C. § 1331 as Plaintiffs' claims arise under the laws of the United States of America.

3. Venue is proper pursuant to 28 U.S.C. § 1402(a)(1) because one or more Defendants' principal offices are located in within this judicial district.

# II.
# PARTIES

4. Plaintiff Casimir George is an individual resident of Harris County, Texas.

5. Plaintiff Joshua Clark is an individual resident of Harris County, Texas.

6. Plaintiff Shyenne White ("Ms. White") is an individual resident of Harris County, Texas. Ms. White brings suit on behalf of herself and as next friend of minor K.W.

7. Plaintiff K.W. is a minor and individual resident of Harris County, Texas.

8. Plaintiff Beverly Ross ("Ms. Ross") appears individually and as representative of the Estate of Dorothy Marie Baker. Ms. Ross is a resident of Harris County, Texas. Ms. Ross is the daughter of Dorothy Marie Baker and is a beneficiary entitled to bring this action under the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code § 71.004 (b), and as an heir, is entitled to Dorothy Marie Baker's estate under the statutes of descent and distribution. Tex. Prob. Code § 38, § 45, et seq.

9. Plaintiff Burney Thibodeaux ("Mr. Thibodeaux") appears individually and as representative of the Estate of Lillie McNairy. Mr. Thibodeaux is a resident of Harris County, Texas. Mr. Thibodeaux is the son of Lillie McNairy and is a beneficiary entitled to bring this action under the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code § 71.004 (b), and as an

heir, is entitled to Lillie McNairy's estate under the statutes of descent and distribution. Tex. Prob. Code § 38, § 45, et seq.

10. Defendant Memorial Hermann Health System is a corporation conducting business in the State of Texas.

11. Defendant Memorial Hermann Medical Group is a corporation conducting business in the State of Texas.

### III.
### JURY DEMAND

12. Plaintiffs hereby demand that all eligible claims be tried to a jury.

### IV.
### FACTS

13. In 2005, the Institute of Medicine ("NAM") released a report finding "racial and ethnic minorities receive lower-quality health care than white people—even when insurance status, income, age, and severity of conditions are comparable." NAM specified that 'lower-quality health care' meant the concrete, inferior care that physicians give their black patients. NAM reported that minority persons are less likely than white persons to be given appropriate cardiac care, to receive kidney dialysis or transplants, and to receive the best treatments for stroke, cancer, or AIDS. NAM concluded that because of these systemic problems "some people in the United States were more likely to die from cancer, heart disease, and diabetes simply because of their race or ethnicity..."

14. In 2018, the Southern Medical Journal published a study of Memorial Hermann patients examining racial discrimination in healthcare. The study found a substantial portion of participants perceived discrimination and unfair treatment in their interaction with Memorial

Hermann's staff and healthcare workers. Nearly 40% of adult patients perceived discrimination in their healthcare interactions. The study stated the discrimination caused the patients to seek healthcare elsewhere. The study finally called for greater analysis to fix the systemic issues and to design policies to fix the inequities present. Memorial Hermann did not act.

15. Shedding further light on the systemic racism deeply rooted within Memorial Hermann, Karl Anthony Simon ("Simon" -- a physician assistant affiliated with Memorial Hermann) testified on May 17, 2019 in *Ozgur Gol v. Karl Anthony Simon* that 'locker room talk' occurred within Memorial Hermann using pejorative terms for people of other cultures including Black patients. Simon's text messages with his colleagues at Memorial Hermann revealed he had stated, "Whitey. The advantages of being a white man can never be matched. All hail whitey. Christian is like the Guatemalans of Hispanic people. Bottom feeders." Simon's text messages continued, "Hoops are for n****rs and white guys that don't have enough eye hand coordination to a baseball or golf ball." Evidence further revealed graffiti written by Simon or his colleagues at Memorial Hermann stating, "Anthony - N****R LOVER 88." The graffiti further featured two swastikas painted in red. Simon further texted his colleagues, "I want to be on the boat right now. Beautiful Saturday like today and I'm in the f****n ER taking care of Mexicans and Canadians." Simon later revealed that 'Canadians' was a pejorative term he used for Black patients. Simon testified that his colleagues at Memorial Hermann also used the same terminology and carried the same racist feelings towards Black and minority patients. In a text from Simon to Memorial Hermann anesthesiologist Heather Simon ("Heather"), Simon stated, "Man there are a lot of n****rs here." The Memorial Hermann anesthesiologist responded, "Lol!" A whistle blower notified Memorial Hermann of this overt racism as early as 2018.

Memorial Hermann did not act. Although this rampant racism was on record as of May 17, 2019, Memorial Hermann continued to allow the physician assistant, anesthesiologist, and all others involved with the racism access to Memorial Hermann's Black patients for months. The results of allowing the systemic racism showed.

16. Moriah Ballard-Johnson ("Ms. Ballard-Johnson") shared her story of Memorial Hermann's racial discrimination on social media. On August 8, 2019, Ms. Ballard-Johnson was admitted to Memorial Hermann for delivery. She was dismissed by Memorial Hermann healthcare workers as not be scheduled for an induction until four more weeks passed. Two days later, Ms. Ballard-Johnson called for her mother to alert the nurse as she was rocked with pain. A total of 45 minutes passed before the Memorial Hermann nurse arrived to place Ms. Ballard-Johnson on a monitor. It became apparent that there was no heartbeat present for the baby. A still-birth resulted. Ms. Ballard-Johnson shared her story calling for equal healthcare from Memorial Hermann.

17. On July 10, 2020, Esohe Omoruyi ("Ms. Omoruyi") took to Instagram to document her inferior treatment while in the cardiac ICU at Memorial Hermann. "I really fell like they will let me die in here," Ms. Omoruyi said. Ms. Omoruyi had requested pain medication after her CATH surgery, but was ignored due to her race. Ms. Omoruyi said, "The nurses told me they couldn't get a hold of my physician to approve the medications which the doctor told me himself he put in as a standing order before he left. I had to call my boss who called our team cardiologist, who then called my cardiologist, who then called me directly to tell me the nurses had never reached out to him about the meds." The Memorial Hermann nurse dismissed Ms. Omoruyi's complaints stating, "It's not the end of the world." Ms. Omoruyi further recounted

how her requests for a shower and basic hygiene were also dismissed, even over two days after undergoing surgery. "This is what we live through. This is why so many Black women are dying," Ms. Omoruyi stated. Ms. Omoruyi informed Memorial Hermann of these discriminatory practices. Memorial Hermann did not act.

18. In July of 2021, Black patient Derrick James filed suit against Memorial Herman alleging an errant incision down his back. Although a Memorial Hermann nurse immediately recognized the wound as an incision, the medical records did not reflect the reality of the matter. Rather, Memorial Hermann argued the wound was merely a bed sore or blister purely because the records kept within their flawed system said so. Memorial Hermann further denied the reality of their systemic issues stating, "It's important to note, however, that Memorial Hermann complies with applicable federal civil rights laws and does not discriminate on the basis of age, race, ethnicity, color, national origin, religion, culture, language, physical or mental disability, socioeconomic status, sex, sexual orientation, and gender identity."

19. In an effort to display the veneer of acting on its systemic issues it simultaneously denied the existence of, Memorial Hermann sought out a new chief equity, diversity, and inclusion officer—Joseph B. Hill ("Mr. Hill"). However, Mr. Hill made the mistake of seeking real change and to truly fix Memorial Hermann's system issues. On July 21, 2021, Memorial Hermann ended its relationship with the new chief equity, diversion, and inclusion officer for being 'too sensitive about race issues.'

20. On November 2, 2021, Memorial Hermann acknowledged its systemic racial failures in statement saying, "With this individual [chief equity, diversity, and inclusion officer]

Memorial Hermann will continue to be the leading employer and healthcare provider of choice for all people and effect real change that will improve the health of our communities."

21. In Fall of 2021, Memorial Hermann announced an initiative to further the veneer of addressing its systemic issues. The initiative sought to "focus on four key initiatives including hiring individuals...who live in these specific communities; making key investments in these neighborhoods, including housing and food insecurity programs; engaging in mindful purchasing from local businesses to further support the economy and infrastructure; and leveraging the System's 29,000 employees as a volunteer force to positively impact neighborhoods and communities." Memorial Hermann committed 0.167% of its billions of dollars collected in cash payments from patients towards this initiative, and, in so doing, redirected attention from its racism within and on its own walls. To be sure, Memorial Hermann's initiative did not address its own systemic issues of providing inferior care to Black patients despite the patients' socio-economic status.

22. Indeed, the inferior care and attention to Black patients continued. On March 8, 2022, Memorial Hermann called Betty Harris to inform her that her husband, Bryant Harris, had passed away while at a Memorial Hermann's emergency room. Mrs. Harris rushed to Memorial Hermann to see her husband's dead body. When she arrived, she noticed the body was not her husband's, but rather, a different patient's body. Memorial Hermann had mixed up the two Black patients and errantly informed Mrs. Harris her husband was dead. Following the privacy law violations of its Black patients caused by careless indifference, Memorial Hermann stated it could not comment on the situation due to patient privacy laws.

23. Defendants knew or should have known their procedures, policies, criteria, and methods of administration had a discriminatory effect on individuals because of their race. Defendants did not take steps to correct these procedures, policies, criteria, and methods of administration. Such procedures, policies, criteria, and methods of administration included the improper keeping of medical records.

24. Between November 11, 2020 and September 18, 2021, Plaintiffs or their deceased loved ones each sought care from Defendants. All patients were Black Americans. Because Defendants failed to correct their procedures, policies, criteria, and methods of administration, all patients received an inferior quality of healthcare. As a result, all Plaintiffs suffered damages. The discriminatory practices specifically led to the untimely deaths of two Black patients.

## V.
## CAUSES OF ACTION COMMON TO ALL PLAINTIFFS

**COUNT ONE: Unlawful Racial Discrimination Pursuant to 42 U.S.C. § 2000d:**

25. Plaintiffs re-allege the foregoing as though fully set forth herein.

26. At all relevant times, Defendants received Federal funds or other Federal financial assistance from the United States of America.

27. At all relevant times, Defendants directly and/or indirectly distinguished among individuals on the basis of race, color, or national origin in the types, quantity, quality, and/or timeliness of program services, aids, and/or benefits provided or in the manner provided. Further, Defendants had procedures, criteria, or methods of administration that had a discriminatory effect on individuals because of their race, color, or national origin. Such discriminatory practices included but were not limited to:

(a) The failure to further investigate and remedy the systemic issues revealed in the study published in the 2018 Southern Medical Journal;

(b) Failure to acknowledge and correct racist and derogatory language and conduct revealed by any and all whistleblowers;

(c) Hiring and retaining staff known to use racist and derogatory language towards ethnic minorities;

(d) Hiring and retaining staff harboring ill-will towards ethnic and racial minorities;

(e) Maintaining affiliations with physicians and contractors known to use racist and derogatory language towards ethnic minorities;

(f) Maintaining affiliations with physicians and contractors harboring ill-will towards ethnic and racial minorities;

(g) Allowing physicians, contractors, staff, employees, and any others known to use racist and derogatory language towards ethnic and minorities access to patients including Black patients;

(h) Allowing physicians, contractors, staff, employees, and any others harboring ill-will towards ethnic and racial minorities access to patients including Black patients;

(i) Failure to listen, engage with, and understand the discriminatory experiences faced by Black patients;

(j) Failure to implement proper systems to report and remedy racially discriminatory activity and practices of staff, employees, and affiliated physicians;

(k) Failure to allow acknowledge, implement, or utilize changes suggested by voices sensitive to racial issues such as Joseph B. Hill;

(l) Failure to properly keep, record, and maintain or have systems to properly keep, record, and maintain accurate medical records for Black patients;

(m) Maintaining an environment conducive to overt racism; and

(n) Maintaining such other policies, procedures, and criteria with disparate impact amongst racial and ethnic minorities including Black patients.

28. As a direct and proximate result of Defendants' discriminatory and complained of actions, Plaintiffs each suffered damages including the untimely deaths of two patients.

29. Such cause of action is common to all Plaintiffs. Plaintiffs' damages stem from the singular ongoing discriminatory conduct of Defendants.

**COUNT TWO: Unlawful Racial Discrimination Pursuant to 42 U.S.C. § 1981:**

30. Plaintiffs re-allege the foregoing as though fully set forth herein.

31. At all relevant times, Plaintiffs were refused adequate care by Defendants on the basis of their race.

32. As a direct and proximate result of Defendants' discriminatory and complained of actions, Plaintiffs each suffered damages including the untimely deaths of two patients.

## VI.
## CAUSES OF ACTION FROM SEPARATE OCCURRENCES

**COUNT THREE: Negligence:**

33. Plaintiffs re-allege the foregoing as though fully set forth herein.

34. At all relevant times, Defendants owed duties to Plaintiffs. Such duties included providing adequate care and methods to ensure adequate care.

35. Defendants breached their duties to Plaintiffs in one or more ways including in failing to properly care for, failure to properly diagnose, failure to properly treat, unnecessary use of

restraints, failure to properly administer medicine, failure to adequately turn, and failure to properly place feeding, catheter and other tubes.

36. As a direct and proximate result of Defendants' negligence complained of actions, Plaintiffs each suffered damages including the untimely deaths of two patients.

**COUNT FOUR *RESPONDEAT SUPERIOR*:**

37. Plaintiffs re-allege the foregoing as though fully set forth herein.

38. At all relevant times, Defendants nurses, employees, agents, and staff were working under the course and scope of their employment for Defendants. Thus, Defendants are vicariously liable under the doctrine of *respondeat superior.*

**COUNT FIVE: Negligent Association of Third-Parties and Contractors:**

39. Plaintiffs re-allege the foregoing as though fully set forth herein.

40. At all relevant times, Defendants maintained affiliations with incompetent physicians. Defendants further allowed admitting privileges to incompetent physicians. Defendants further allowed incompetent physicians access to patients including Plaintiffs.

41. Defendants knew or should have known the physicians operating on, advising, or otherwise administering healthcare to Plaintiffs were incompetent.

42. As a direct and proximate result of Defendants conduct, Plaintiffs were harmed receiving injuries and damages.

## VII.
## CAUSE OF ACTION SPECIFIC TO PLAINTIFF CASIMIR GEORGE

**COUNT SIX: Unlawful Restraint:**

43. Plaintiffs re-allege the foregoing as though fully set forth herein.

44. At all relevant times, Defendants knowingly restrained Plaintiff Casimir George. Such restraint was unnecessary given Plaintiff Casimir George's conduct.

45. As a direct and proximate result of Defendants' unlawful restraint and other conduct Plaintiff Casimir George suffered damages and injuries including the inability to properly use the restroom and infection.

## VIII.
## CAUSE OF ACTION SPECIFIC TO PLAINTIFF JOSHUA CLARK

**COUNT SEVEN: Failure to Examine and Treat Pursuant to 42 U.S.C. § 1395dd:**

46. Plaintiffs re-allege the foregoing as though fully set forth herein.

47. At all relevant times, Plaintiff Joshua Clark refused treatment prior to stabilization as the term is defined by 42 U.S.C. § 1395dd(e)(3).

48. As a direct and proximate result of Defendants' unlawful failure to examine, treat, and other complained of actions, Plaintiff Joshua Clark suffered damages and injuries including the worsening of a condition that could have been alleviated if timely treated.

## IX.
## GROSS NEGLIGENCE AND REQUEST FOR PUNITIVE DAMAGES

**COUNT EIGHT: Gross Negligence:**

49. Plaintiffs re-allege the foregoing as though fully set forth herein.

50. At all relevant times, Defendants acted willfully, knowingly, and/or recklessly in their actions of discrimination, negligence, and other conduct that severely harmed Plaintiffs. Such conduct has included the altering of medical records or inaccurate keeping of medical records.

51. As such, Plaintiffs seek punitive damages for Defendants' gross negligence.

# X.
# DAMAGES

52. As a proximate result of Defendants' complained of conduct and inaction, Plaintiffs suffered extensive injuries and damages including the following damages:

   a. Medical expenses in the past and future;

   b. Physical pain and suffering in the past and future;

   c. Mental anguish in the past and future;

   d. Disfigurement in the past and future;

   e. Physical impairment in the past and future;

   f. Loss of consortium in the past and future;

   g. Plaintiffs' pecuniary loss from the deaths of Dorothy Marie Baker and Lillie McNairy including loss of care, maintenance, support, services, advice, counsel, and contribution of pecuniary value that they would, in all reasonable probability, have received from Dorothy Marie Baker and Lillie McNairy during their lifetime had they lived;

   h. Plaintiffs' loss of companionship and society fron the date of the incident and which will continue in the future, including, but not limited to the loss of positive benefits flowing from the love, comfort, companionship, and society that the daughters, in reasonable probability, would have received from Dorothy Marie Baker and Lillie McNairy had they lived;

   i. Funeral and burial expenses incurred as a result of Dorothy Marie Baker and Lillie McNairy's death;

   j. Unliquidated damges within the jurisdictional limits of this Court;

k. Attorney's fees;

l. Punitive damages; and

m. All other relief, in law and in equity, to which Plaintiff may be entitled.

## XI.
## SURVIVORSHIP DAMAGES

53. As a proximate result of Defendants' complained of conduct and inaction, Decedents Dorothy Marie Baker and Lillie McNairy each suffered damages during their lifetime that now survive through their estate. Such damages include but are not limited to the following:

a. Medical expenses in the past and future;

b. Physical pain and suffering;

c. Mental anguish;

d. Disfigurement; and

e. Physical impairment.

## XII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that Defendants be summoned to appear and answer herein, and that upon final hearing thereof, Plaintiffs have:

a. Judgment against Defendants for Plaintiffs' past and future damages;

b. Interest on the judgment at the legal rate from the date of judgment;

c. Pre-judgment interest on Plaintiffs' damages as allowed by law;

d. All costs of court; and

e. Such other and further relief to which Plaintiffs may be justly entitled.

Respectfully Submitted,

**Israel Perez Law, PLLC**

_____
Israel Garcia Perez III
Texas Bar No. 24102349
SDTX No. 3745629
Israel.Perez@IsraelPerezLaw.com
PO Box 260
Fate, Texas 75132
Phone: (972) 813-9025
Fax:    (972) 942-8935
Please include IsraelPerezLaw@gmail.com on all e-serve documents

**ATTORNEY FOR PLAINTIFFS**